UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LAURENT COTE,

                Plaintiff,

v.                                       Case Number 11-11908
                                       Honorable Thomas L. Ludington

LOWE'S HOME CENTER, INC.,

                Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

A man drives his motorized wheelchair down the main aisle of a Lowe's Home Center store. At the same time, an employee on a ladder moves boxes on the top shelf in a side aisle. As the man in the wheelchair passes by the side aisle, a box falls from the shelf that the employee is working on. The box — ten inches high and three feet long — strikes the man in the back of the head. Knocked unconscious, the man loses control of the wheelchair, which veers into a metal refrigerator, throwing the man forward.

The question in this case is whether based on these factual allegations the man may assert claims for premises liability or ordinary negligence or both under Michigan law.

Plaintiff Laurent Cote has brought suit against Defendant Lowe's Home Centers, Inc., asserting claims for premises liability, ordinary negligence, gross negligence, and grossly negligent hiring/retention. Defendant now moves for summary judgment. ECF No. 10.

Because Plaintiff has introduced no evidence of gross negligence, or grossly negligent hiring/retention, Defendant is entitled to summary judgment on those claims. But because Plaintiff has introduced eyewitness testimony that the box fell from the very shelf that the

employee was working on, it reasonable to infer that the box fell either because of the condition of the premises or the acts of the employee.[1]  Consequently, under the circumstances of this case, the claims of premises liability and ordinary negligence are not mutually exclusive — and Defendant is not entitled to summary judgment on either.  Accordingly, the Court will grant in part and deny in part Defendant's motion.

## I

### A

A falling tree branch broke Plaintiff's neck in 1980.  Pl. Dep. 54:3–11, 57:20–22, Sept. 28, 2011, *attached as* Def.'s Mot. Summ. J. Ex. 2; *see also* Lingenfelter Medical Records 2, *attached as* Pl.'s Resp. Ex. E (noting the blow fractured Plaintiff's C4–C5 vertebrae).  Plaintiff 22 years old at the time, was left unable to move "[f]rom, like, the midstomach area all the way down."  Pl. Dep. 57:13.  Plaintiff did, however, retain "normal functions of his upper extremities."  Levin Medical Records, at 1, *attached as* Pl.'s Resp. Ex. F.

About thirty years later, Plaintiff alleges, another falling object struck him in the head and injured him, giving rise to this litigation.

On the evening of April 9, 2008, Plaintiff went to Lowe's Home Center in Saginaw, Michigan, to purchase a bathroom medicine cabinet.  Pl. Dep. 62:15–23, 105:8–20.  Plaintiff was in a motorized wheelchair.  Pl. Dep. 47:18–48:3.  With him were two gentlemen, Floyd Hall and Rick Ramirez, who both worked part time for Plaintiff.  Pl. Dep. 63:11–12.

---

[1] The Michigan Supreme Court observes that "as early as 1891, the dangerous potentiality of the force of gravity . . . had come to the attention of the Michigan [Supreme] Court." *Gadde v. Mich. Consol. Gas Co.*, 139 N.W.2d 722, 724 (Mich. 1966) (citing *Barnowsky v. Helson,* 50 N.W. 989 (Mich. 1891)); *see generally* Sir Isaac Newton, *Philosophiæ Naturalis Principia Mathematica* (1st ed. 1687) (proposing universal law of gravitation).

On entering the store, Plaintiff asked one of Defendant's employees "where are the bathroom cabinets?  And he said down towards the lumber aisle.  So we [went] down towards the lumber."  Pl. Dep. 90:15–17.

As the gentlemen moved down the store's main aisle towards the lumber section, Mr. Ramirez recalled that he had a job to do involving wood paneling.  Pl. Dep. 90:24–91:9. Plaintiff recollects: "So he took off in the paneling, said he'd meet up with us later."  Pl. Dep. 91:1–4.  Plaintiff and Mr. Hall continued down the main aisle towards the lumber section, glancing down the aisles that they passed for medicine cabinets.  Pl. Dep. 92:4–6.

In one aisle, Plaintiff and Mr. Hall saw an employee and a ladder.  *See* Pl. Dep. 111:12–112:11; Hall Dep. 69:5–21, Mar. 7, 2012, *attached as* Def.'s Mot. Ex. 3.  The ladder had a series of steps leading to a platform.  Hall Dep. 80:8–10.  Plaintiff recalls that when he passed the employee and ladder for the first time, the employee was near the ladder "like opening boxes or something."  Pl. Dep. 112:2–3.  Mr. Hall disagrees, recalling that the employee was already on the ladder "shuffling boxes around."  Hall Dep. 70:25–71; *see also* Hall Dep. 69:5–25.

Eventually, Plaintiff and Mr. Hall reached the lumber section without seeing the medicine cabinets, and so asked another employee for directions.  Pl. 116:1–17.  "The guy pointed, said you've got to go all the way down to where you came," Plaintiff recounts.  Pl. 116:1–17.

Returning the way they came, Plaintiff and Mr. Hall again approached the aisle with the employee and the ladder.  Pl. Dep. 118:10–18.  This time, the gentlemen agree, the employee was on the platform on top of the ladder moving boxes on the shelf.  *Compare* Pl. Dep. 118:15, *with* Hall Dep. 90:15–21.  Counsel for Defendant asked Plaintiff in his deposition:

> Q:  Did [the employee] actually take a box off and hand it to a customer that you saw?
> A:  I know he was working on moving the boxes around.
> Q:  Did you see him touch a box?

A:  Yeah, I seen him, boxes in his hand.
Q: Did you see him remove a box from anywhere?
A: From the, yeah, the area that he was working in, yeah.
Q: What did he do with that box?
A:  He started [—] I think he was starting to go down the ladder, and then after that, that was it.
Q: What do you mean after that, that was it?
A: That's where I got hit.
Q:  Okay.  So you don't remember anything other than you see some guy, you think a Lowe's employee, on a ladder.  You say that you see [him] grab a box, is that what you are saying?
A: Yeah.
Q: Is that a yes?
A: Yes.
Q: All right.  And did you see him hand it to a customer?
A: I don't know after that.  I got hit, so I don't know what happened after that. . . .
Q: Okay, so you're saying that you don't have any recollection of anything after when you get, you think you get hit?
A: Right.

Pl. Dep. 94:5–95:1, 96:25–97:3.  Returning to this incident later in the deposition, counsel for

Defendant asked:

Q:  Before, in terms of your recollection of this particular incident, how close to the actual incident, as you understand it, does your memory go?
A: As soon as the box hit me, that was it.
Q: Do you remember even seeing the box fall?
A: No.
Q: Do you remember even seeing anything fall whatsoever?
A: No.
Q:  Okay.  So you don't know if a box even fell on you.  All you know is you were going down the aisle and then you have no memory?
A: I felt something hit my head, so it must have been a box.
Q: Well, but how would you know that unless you saw it?
A: Right.  Yeah.
Q: But you didn't see a box hit you in the head?
A: No.

Pl. Dep. 127:2–17.  Probing further, counsel for Defendant put forward Defendant's theory of the

case — that Plaintiff was not hit in the head by a falling box, but rather hit an object with his

wheelchair, lost control, and ran into a refrigerator.  Counsel asked:

> Q: As we sit here today, you don't know if you hit an unknown object and lost
> control of your wheelchair and ran into a refrigerator; you don't know if that
> is accurate or not?
> A: No.
> Q: No, you don't know?
> A: All I know is the box hit me, guy.  You know, what can I say?  You asked me
> about ten different times.

Pl. Dep. 151:18–24.  Mr. Hall, unlike Plaintiff, testifies that he remembers seeing the box fall.  In

Mr. Hall's deposition, counsel for Defendant asked:

> Q: What my focus is on, when you saw [the employee] the first time, what he
> was doing with those boxes.  And you say he was stacking them in some
> manner, and I'm just trying to figure out if he's stacking — you see him
> stacking four tan boxes on top of each other saying, ooh, these look nice and
> pretty.  Or is he doing something else?  I mean do you have any idea what
> he's doing up there?
> A: No.
> Q: All right.  And then the second time you see this employee, what is it that you
> recall him doing with the box?
> A: That's when I noticed the one that fell and hit Larry.
> Q: Okay, and in terms of the box itself, do you know what [—] which box it was
> or what box —
> A: Tan box.
> Q: All right, it was a tan box?
> A: Yes.
> Q: And did you see the tan box actually fall?
> Q: Yes.
> A: Did it come off the top shelf, or did it come out of the employee's hands?
> Q: It came off the very top shelf.  The one that [the] employee was working on.
> A: And how did it come off?
> Q: Probably from him moving them around.

Hall Dep. 90:22–91:25.  Rephrasing the inquiry, counsel for Defendant continued:

> Q: All right. Did you actually see it come off the top shelf?
> A: Yeah, because when it came, it did like a little swerve. . . .
> Q: All right.  And did you see why it is that the box came off the shelf?
> A: No, because I was like ten feet in back of him.

Hall Dep. 92:7–9, 93:9–11.  Asked to explain, Mr. Hall elaborated: "I was 10 feet behind Larry.

I'm not up by the aisle yet to see how it happened.  But that box [fell from] where that guy was

standing at, doing the work."  Hall Dep. 94:3–5.  Asked if he called out a warning to Plaintiff,

Mr. Hall responded: "No, because I just froze."  Hall Dep. 107:17–20.

     The box — about ten inches high and three feet long — struck Plaintiff behind the right

ear, Mr. Hall recalls.  Hall Dep. 78:1–15, 106:1–6.  Counsel for Defendant asked:

> Q:  [Y]ou see the box come into the back side of Larry's head.  Does it fall to the
> ground?
> A:  Yes.
> Q:  Is it in the main aisle at that point?
> A:  Yes.
> Q:  All right.  And then what happens with Larry?
> A:  He's like slouched down in his chair and he was knocked out, and that's when
> he ran into the refrigerators.
> Q:  Okay.  Did he go directly from getting hit on the head to going towards the
> refrigerators?
> A:  Yeah.

Hall Dep. 108:14–25.  Mr. Hall later elaborated that after Plaintiff was knocked out, his hand

involuntarily pressed the wheelchair's joystick, propelling him forward.  Hall Dep. 112:4–113:1.

Careening off a flatbed cart, Plaintiff's wheelchair ran into a refrigerator, knocking Plaintiff

forward.  Hall Dep. 108:19–109:16.

     Mr. Ramirez was still looking at wood paneling when the box (allegedly) fell.  Hall Dep.

127:2–5.  He recalls, "I hear a noise, like a little crash or, I don't know, like metal or whatever.  I

turn around and like this, I look and I just see, like, seconds of Larry flying down the aisle.

That's all."  Ramirez Dep. 24:6–11, Jan. 20, 2012, *attached as* Def.'s Mot. Ex. 2.

     Mr. Hall and Mr. Ramirez rushed to Plaintiff.   Hall Dep. 119:9–120:7, 128:4–12;

Ramirez Dep. 24:10.   Slumped forward over the still-running wheelchair, Plaintiff was

unconscious, Mr. Hall reports.  *Id*.  Mr. Hall turned the wheelchair off, leaned Plaintiff back into

the chair, and went to get help.  Hall Dep. 108:11–13, 119:9–120:7.

Finding an employee, Mr. Hall recounts, "I said can you call 911?  And that's when he came over and tried to wake up Larry.  After 15 minutes has gone by, he goes ahead and does it." Hall Dep. 130:13–15.

**B**

Emergency medical technicians responded to the 911 call, transporting Plaintiff to St. Mary's Hospital.  Hall Dep. 132:16–17; Mobile Medical Response Patient Care Report, *attached as* Def.'s Mot. Ex. 5.  The EMT's report relates: "Bravo 14 and Alpha 24 dispatched priority 1 to Lowe's for a male who crashed his amigo into a fridge and was suffering from neck pain. [Patient] in wheelchair, supine position.  [Patient] told us what had happened and indicated that he was having neck pain.  C-spine precautions were taken at this time. . . .  [Patient] was transported to [St.] Mary's North without incident."  Mobile Medical Response Patient Care Report, at 3.

It is not clear whether Defendant prepared an incident report after the accident.  *See* Hall Dep. 126:1 ([Counsel for Defendant]: "I showed you earlier the incident report.").  Such a report, if it exists, has not been not made part of the record.  Likewise, the identities of Defendant's employees present that day (including the employee on the ladder) are not made part of the record.  In fact, aside from Plaintiff and Mr. Hall, no other witnesses to the incident are made part of the record.

The incident occurred about 7:30 p.m.; Plaintiff arrived at St. Mary's about 8 p.m.  *See* St. Mary's of Michigan Emergency Record, *attached as* Pl.'s Resp. Ex. C.  The  hospital's emergency record reports:

> Patient reported the incident at Lowes.  Stated that he was in his motorized chair. He hit an unknown object and lost control of his wheelchair running into a refrigerator.   [P]atient  reported  jolted  forward.    There  was  no  loss  of consciousness although patient struck his head on appliance and was "dazed."

> Denies any chest pain or palpitations. He did report right shoulder pain. Denies any new numbness or tingling but has decrease sensation below the nipples secondary to a 30 year history of quadriplegia. Per [EMTs] patient had stable vital signs and was taken to hospital via basic ambulance for further evaluation and treatment.

*Id*. at 2. A number of tests were performed on Plaintiff at St. Mary's, including a CT scan of the spine and a CAT scan of the brain. *See id*. at 4–6. Plaintiff was diagnosed with "acute closed head injury." *Id*. at 7.

Although the treating physician recommended that Plaintiff be admitted, he "signed out against medical advice." *Id*.; *see also* Pl. Dep. 153:3–7 ("Yeah, I left. . . . They wanted me to stay in the hospital because I had a severe concussion, and the doctor was pissed because I wanted to leave. Because they were going to stick a catheter in me, and I could die from infection.").

When Plaintiff returned home from the hospital, Mr. Hall observed a lump on the back of Plaintiff's head. Hall Dep. 118:8–11; *but see* St. Mary's Emergency Record, at 1 (noting that Plaintiff presented with a "forehead abrasion," but not noting injuries to the back of the head).

In July 2008, about three months after the accident, Dr. Joel Beltran performed a neurological examination of Plaintiff. Beltran Medical Records, at 2–3, *attached as* Pl.'s Resp. Ex. D. Dr. Beltran noted that Plaintiff reported "decreased strength in his arms as well as tingling sensation," *id*. at 2, concluding: "I suspect this is secondary to post concussion syndrome with likely musculoskeletal pain." *Id*. at 3.

In August 2008, Plaintiff saw Dr. Richard Lingenfelter. Lingenfelter Medical Records, *attached as* Pl.'s Resp. Ex. E. Dr. Lingenfelter reported that Plaintiff was unable to use his right hand and had limited use of his left hand, elaborating: "His right hand, his fingers are all panned up and look to be very uncomfortable, but patient denies any pain associated with that since he is

-8-

unable to feel.  His left hand he does have in a swing arm attached to his wheelchair and he is able to bend his tips of his fingers and very limited mobility and function.  He is unable to move his bilateral lower extremities."  *Id*. at 3.  (This limitation of use of his upper extremities, Plaintiff contends, is a direct result of the accident at issue in this case.)

**C**

Plaintiff commenced this case by filing suit against Defendant in the Saginaw Circuit Court.  The complaint, as noted asserted claims for premises liability, ordinary negligence, gross negligence, and grossly negligent hiring/retention.  In April 2011, Defendant removed the case to this Court.  Defendant now moves for summary judgment on each of Plaintiff's claims.

**II**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

# III

# A

Defendant first moves for judgment on Plaintiff's premises liability claim because the dangerous condition was "open and obvious." Def.'s Br. Supp. Mot. Summ. J. 9–11. Defendant's argument is unpersuasive.

"Premises liability," the Sixth Circuit explains, "is a specific type of negligence claim based on an injury that arises out of a condition on the property as opposed to an injury arising out of the activity or conduct that created the condition." *DeBusscher v. Sam's E., Inc.*, 505 F.3d 475, 479 (6th Cir. 2007) (citing *James v. Alberts*, 626 N.W.2d 158, 162 (Mich. 2001)) (applying Michigan law); *see generally* 1 *Torts: Michigan Law & Practice* ch. 9 (ICLE 2012).

"For purposes of premises liability, Michigan courts recognize three common-law categories: trespasser, licensee, and invitee." *Id.* (quoting *Kessler v. Visteon Corp.*, 448 F.3d 326, 336–37 (6th Cir. 2006)). In this case, it is undisputed that Plaintiff was an invitee, "one who enters a premises to conduct business that concerns the premises owner at the owner's express or implied invitation." *Riddle v. McLouth Steel Prods. Corp.*, 485 N.W.2d 676, 679 n.4 (Mich. 1992).

Under Michigan law, "the general rule regarding the duty of a business establishment to its invitees is that when [the business] invites others onto its premises it must exercise ordinary care and prudence to keep the premises reasonably safe." *Swartz v. Huffmaster Alarms Sys., Inc.*, 377 N.W.2d 393, 395 (Mich. Ct. App. 1985) (citing *Preston v. Sleziak*, 175 N.W.2d 759 (Mich. 1970)). For example, "It is the duty of a storekeeper to provide reasonably safe aisles for customers and he is liable for injury resulting from an unsafe condition either caused by the active negligence of himself and his employees or, if otherwise caused, where known to the

storekeeper or is of such a character or has existed a sufficient length of time that he should have had knowledge of it." *Clark v. Kmart Corp.*, 634 N.W.2d 347, 348 – 49 (Mich. 2001) (emphasis omitted) (quoting *Serinto v. Borman Food Stores*, 158 N.W.2d 485 (Mich. 1968)).

Summarizing the invitor's duty in *Conerly v. Liptzen*, 199 N.W.2d 833 (Mich. Ct. App. 1972), the court explained:

> The occupier is not an insurer of the safety of invitees, and his duty is only to exercise reasonable care for their protection. But the obligation of reasonable care is a full one, applicable in all respects, and extending to everything that threatens the invitee with an unreasonable risk of harm. The occupier must not only use care not to injure the visitor by negligent activities, and warn him of latent dangers of which the occupier knows, but he must also inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use.

*Id.* at 836 (quoting William Prosser, *Torts* 402–03 (3d ed. 1964)). The Michigan Supreme Court cautions, however, that "this duty does not generally require the removal of open and obvious dangers." *Ghaffari v. Turner Const. Co.*, 699 N.W.2d 687, 690 (Mich. 2005). The court elaborates, "Where the dangers are known to the invitee or are so obvious that the invitee might reasonably be expected to discover them, an invitor owes no duty to protect or warn the invitee unless he should anticipate the harm despite knowledge of it on behalf of the invitee." *Lugo v. Ameritech Corp., Inc.*, 629 N.W.2d 384, 386 (Mich. 2001); *see generally Restatement (Second) of Torts* § 343A(1) (1965) ("A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.").

In *Lugo*, for example, a plaintiff fell after stepping in a pothole in the defendant's parking lot. 629 N.W.2d at 385. The trial court, concluding the hole was an "open and obvious" danger, granted the defendant summary judgment. *Id.* The court of appeals reversed. *Id.* The Michigan

Supreme Court reversed the judgment of the court of appeals and reinstated the judgment of the trial court, concluding that "an 'ordinarily prudent' person would typically be able to see the pothole and avoid it." *Id*. at 388 (citation omitted) (quoting *Bertrand v. Alan Ford, Inc*., 537 N.W.2d 185 (Mich. 1995)).

Similarly, in *Garret v. W.S. Butterfield Theaters*, 246 N.W. 57 (1933), the plaintiff tripped on a step and fell. The Michigan Supreme Court held that the defendant was under no "duty to prevent careless persons from hurting themselves." *Id*. at 58. "A reasonably prudent person," the court wrote, "watching where he is going, would have seen the step. Defendant is not under legal duty to prevent careless persons from hurting themselves." *Id*.

Although *Lugo* and *Garret* are instructive on the open and obvious doctrine, they are distinguishable from the facts of this case in one crucial respect: Both of those cases involved a stationary danger, not a moving one. When the danger is a falling object, courts are far more willing to find a question of fact exists as to whether an ordinarily prudent person would have been able to avoid the danger. *See generally* Michael P. Sullivan, Annotation, *Liability for Injury to Customer or Other Invitee of Retail Store by Falling of Displayed, Stored, or Piled Objects*, 61 A.L.R. 4th 27 (1988) (collecting cases).

In *McLennan v. Home Depot U.S.A., Inc.*, 10 F. Supp. 2d 837 (E.D. Mich. 1998) (Duggan, J.), for example, the plaintiff was shopping for bricks at a Home Depot. *Id*. at 837. Stacked on a shelf, the bricks were "displayed with a thin metal band wrapped around them." *Id*. at 838. As the plaintiff leaned down towards the floor, "bricks fell from the shelf striking plaintiff in the head." *Id*. at 837–38. No one was touching the shelf when the bricks fell. *Id*. at 837. Applying Michigan law, the court rejected the defendant's "open and obvious" argument and denied summary judgment. *Id*. at 840. The court explained that "whether a reasonably

prudent person would have been able to discover the danger and the risk presented by the stack of banded bricks is an issue to be left for the jury." *Id.* (footnote omitted).  Turning to the defendant's lack of causation argument, the court further observed that "though Michigan does not purport to follow the doctrine of res ipsa loquitur, it achieves the same result by allowing negligence to be inferred from circumstantial evidence." *Id.* at 839.  The court continued:

> Applying the above principles to the instant facts in the light most favorable to the plaintiff, a jury might infer negligence from the evidence presented.  First, this is the type of event that does not occur in the absence of someone's negligence.  Bricks should not fall if properly stacked and secured.  Securing the bricks and maintaining their display in good repair is the duty of the business invitor.  The testimony of the plaintiff provides that no one was touching the bricks when they fell.  The testimony of the witness provides that a "pop" sound was heard just prior to the bricks falling.  All of this testimony could lead to the reasonable inference that the bricks fell from the banded area after the wire band broke.

*Id.* at 840 (footnote omitted); *see generally* Louis A. Lehr, Jr., 3 *Premises Liability 3d* § 49:17 (West 2012) (collecting cases and noting "A storekeeper has a duty to exercise reasonable care in displaying its products so that they will not fall and injure customers").

More recently, the same result was reached in *Costa v. Sam's East, Inc.*, No. 11–0297–WS–N, 2012 WL 2499020 (S.D. Ala. June 26, 2012).[2]  There, the plaintiff alleged that he was injured when a television fell from a shelf at a Sam's Club.  *Id.* at 1.  The defendant raised an "open and obvious" defense.  Denying the defendant's motion for summary judgment, the court explained "a reasonable jury could find that that the risk that a television would fall from a shelf onto nearby customers was not open and obvious because the danger existed only for a few seconds before Plaintiff was injured."  *Id.*  (internal quotation marks omitted).

---

[2] As an aside, although the court in Costa was applying the premises liability law of Alabama, not Michigan, both jurisdictions follow the "open and obvious" rule announced in the *Restatement (Second) of Torts* § 343A (quoted above).  *Compare, e.g.*, *Bertrand v. Alan Ford, Inc.*, 537 NW2d 185, 186 (Mich. 1995) (quoting *Restatement (Second) of Torts* § 343A (1965)), *with Hines v. Hardy*, 567 So.2d 1283, 1284 (Ala. 1990) (same).

The defendant moved for reconsideration, arguing that the court "failed to recognize that the open and obvious nature of the hazard." *Id*. Again rejecting the defendant's argument, the court collected a number of cases finding that falling objects are not open and obvious dangers. *Id*. at 2 (collecting cases). In a footnote, the court cautioned:

> A fair question which Sam's does not address is whether the "open and obvious" doctrine has any logical application to this case at all. . . . Again, the evidence in the light most favorable to plaintiff is that a Sam's employee actively tipped a television set over onto the plaintiff. As such, this case appears distinguishable from the "foreign substance on the floor" type of cases that are the paradigmatic premises liability situation where an "open and obvious" defense might apply. The parties should give careful consideration in the coming weeks to whether jury instructions in this case should be structured under a respondeat superior framework rather than a premises liability framework.

*Id*. at 3 n.3.

In this case, as in *McLennan* and *Costa*, whether a reasonably prudent person would have been able to discover the danger presented by the box that allegedly fell and hit Plaintiff is an issue for the jury. Mr. Hall testified that he saw a box fall from a shelf and hit Plaintiff in the head, but did not have time to call out a warning. *See, e.g.*, Hall Dep. 92:7–9, 93:9–11. (Asked if he called out a warning to Plaintiff, Mr. Hall responded: "No, because I just froze." Hall Dep. 107:17–20.) Plaintiff testified that although he saw the employee shuffling boxes on the ladder, Plaintiff did not see the box that fell and hit him, much less have an opportunity to avoid it. *See, e.g.*, Pl. Dep. 94:7–95:1, 96:25–97:3. Defendant offers no testimony challenging this version of events. Defendant is not entitled to judgment as a matter of law on Plaintiff's premises liability claim.

Against this conclusion, Defendant writes: "Where the condition is neither remarkable or unavoidable, the open and obvious doctrine bars liability. There is nothing remarkable about an employee using a ladder to reach a shelf, nor is it unusual for an employee to be moving boxes.

There was nothing remarkable about the complained of condition." Def.'s Br. 10–11 (citation omitted).

Defendant offers no evidence, however, that stock falls from the shelves of its Saginaw store with such regularity that walking its store aisles is an "open and obvious danger." This is not to suggest that Defendant cannot establish this (although establishing the regularity of falling stock likely would not insulate Defendant from liability). At present, however, Defendant has not made this showing.

Defendant is not entitled to summary judgment on Plaintiff's premises liability claim.

**B**

Defendant next moves for summary judgment on Plaintiff's negligence/gross negligence claim, asserting: "There is no evidence of even negligent conduct by the unknown and unidentified employee, let alone grossly negligent conduct." Def.'s Br. 11–12. Although Defendant is correct that Plaintiff has produced no evidence of grossly negligent conduct, Defendant is not correct that Plaintiff has not produced evidence of negligence.

"To establish a prima facie case of negligence," the Michigan Supreme Court instructs, "a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W.2d 553, 556 (Mich. 2011) (citing *Roulo v. Auto. Club of Mich.*, 192 N.W.2d 237 (Mich. 1971)).

In this case, it is undisputed that Defendant owed Plaintiff, a business invitee, a legal duty. *Swartz v. Huffmaster Alarms Sys., Inc.*, 377 N.W.2d 393, 395 (Mich. Ct. App. 1985)

(quoted above).  It is likewise undisputed that Plaintiff suffered some damages (as discussed below, Defendant challenges the extent of Plaintiff's claimed damages).  At issue is causation.

Defendant asserts "there is no evidence that Defendant caused Plaintiff's alleged accident.  Although Plaintiff claims that he thinks an employee dropped a box on his head, neither he nor his eyewitness employee can testify that such an event occurred.  Plaintiff did not see a box, a medicine cabinet, or anything else fall.  Mr.  Hall likewise cannot testify that the Lowe's employee on the ladder dropped a box, or even caused a box to fall."  Def.'s Br. 8.  Although Defendant is correct that Plaintiff offers no direct evidence that an employee dropped a box on Plaintiff's head, Plaintiff does offer sufficient circumstantial evidence that the employee caused the box to fall.

Under Michigan law "negligence may be established by circumstantial evidence," with the Michigan Supreme Court explaining that "where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inferences from established facts, that at least a prima facie case is made."  *Gadde v. Mich. Consol. Gas Co.*, 139 N.W.2d 722, 724 (Mich. 1966) (citing *Burghardt v. Detroit United Ry.*, 547, 173 N.W.2d 360, 361 (Mich. 1919)).  "To be adequate," the court continues, "a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation."  *Skinner v. Square D Co.*, 516 N.W.2d 475, 480 (Mich. 1994).  Discussing "the basic legal distinction between a reasonable inference and impermissible conjecture," the court elaborates:

> As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only.  On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.

-16-

*Id.* (quoting *Kaminski v. Grand Trunk W.R. Co.*, 79 N.W.2d 899 (Mich. 1956)); *see also Gadde*, 139 N.W.2d at 724 (observing that "as early as 1891, the dangerous potentiality of the force of gravity . . . had come to the attention of the Michigan [Supreme] Court even to the extent of an 'almost conclusive' presumption." (quoting *Barnowsky v. Helson,* 50 N.W. 989 (Mich. 1891)).

Here, the circumstantial evidence indicates a logical sequence of cause and effect — the employee's careless handling of the boxes on the shelf caused one to fall, hitting Plaintiff. Counsel for Defendant asked Plaintiff in his deposition:

> Q: Did [the employee] actually take a box off and hand it to a customer that you saw?
> A: I know he was working on moving the boxes around.
> Q: Did you see him touch a box?
> A: Yeah, I seen him, boxes in his hand.
> Q: Did you see him remove a box from anywhere?
> A: From the, yeah, the area that he was working in, yeah.
> Q: What did he do with that box?
> A: He started [—] I think he was starting to go down the ladder, and then after that, that was it.
> Q: What do you mean after that, that was it?
> A: That's where I got hit.

Pl. Dep. 94:5–16. Mr. Hall, unlike Plaintiff, testifies that he remembers seeing the box fall and strike Plaintiff in the head. In Mr. Hall's deposition, counsel for Defendant asked:

> Q: What my focus is on, when you saw [the employee] the first time, what he was doing with those boxes. And you say he was stacking them in some manner, and I'm just trying to figure out if he's stacking — you see him stacking four tan boxes on top of each other saying, ooh, these look nice and pretty. Or is he doing something else? I mean do you have any idea what he's doing up there?
> A: No.
> Q: All right. And then the second time you see this employee, what is it that you recall him doing with the box?
> A: That's when I noticed the one that fell and hit Larry.
> Q: Okay, and in terms of the box itself, do you know what [—] which box it was or what box —
> A: Tan box.
> Q: All right, it was a tan box?

-17-

> A:  Yes.
> Q:  And did you see the tan box actually fall?
> Q:  Yes.
> A:  Did it come off the top shelf, or did it come out of the employee's hands?
> Q:  It came off the very top shelf.  The one that [the] employee was working on.
> A:  And how did it come off?
> Q:  Probably from him moving them around.

Hall Dep. 90:22–91:25.  Rephrasing the inquiry, counsel for Defendant continued:

> Q:  All right. Did you actually see it come off the top shelf?
> A:  Yeah, because when it came, it did like a little swerve. . . .
> Q:  All right.  And did you see why it is that the box came off the shelf?
> A:  No, because I was like ten feet in back of him.

Hall Dep. 92:7–9, 93:9–11.  Asked to explain, Mr. Hall elaborated: "I was 10 feet behind Larry.
I'm not up by the aisle yet to see how it happened.  But that box [fell from] where that guy was
standing at, doing the work."  Hall Dep. 94:3–5.

From this evidence, a reasonable juror could infer that the employee's actions caused the
box to fall.  More particularly, a reasonable juror could conclude that the employee did not use
ordinary care and that this lack of care caused Plaintiff's injuries.  Defendant is not entitled to
summary judgment on Plaintiff's negligence claim.

Against this conclusion, Defendant argues in its reply brief that Plaintiff's negligence
claim "is simply a restatement of his premises liability claim, and cannot stand as a separate
action for negligence.  Michigan law is clear that when a plaintiff asserts an injury as a result of a
condition of the land, even when that condition is created through the active negligence of the
premises owner, the claim is exclusively one of premises liability."  Def.'s Reply Br. 2.
Defendant's argument, though theoretically interesting because it requires attention to the
justification for the legal duty in each circumstance, is unpersuasive.

Defendant is correct that under Michigan law if a plaintiff alleges that his injury was
caused only "by a condition of the land . . . his claim sounds exclusively in premises liability."

*Kachudas v. Invaders Self Auto Wash, Inc.*, 781 N.W.2d 806, 806 (Mich. 2010).   In   *James   v.  Albert*, 626 N.W.2d 158 (Mich. 2001), for example, the Michigan Supreme Court noted in dicta that a plaintiff who tripped over a partially buried cable in a trench had a claim for premises liability, not ordinary negligence.  *Id*. at 162.

And Defendant is correct that in a case if a box falls without any employees being present, a reasonable argument could be made that the claim would sound in premises liability, not ordinary negligence.[3]  This, however, is not that case.  Here, it is reasonable to infer that Plaintiff's alleged injury was not caused by "by a condition of the land," but by an employee's activities — specifically, his lack of care in handling the boxes.  Defendant is not entitled to summary judgment on Plaintiff's negligence claim.

Defendant is, however, entitled to summary judgment on Plaintiff's gross negligence claim because Plaintiff has introduced no evidence that the employee acted recklessly or demonstrated a substantial lack of concern for whether an injury results from his activities.  *See Xu v. Gay,* 668 N.W.2d 166, 170 (Mich. Ct. App. 2003) (defining "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results").

## C

Defendant next moves for summary judgment on Plaintiff's negligent hiring/retention claim.  As noted, Plaintiff does not contest that Defendant is entitled to judgment as a matter of law on this claim.  Moreover, an independent review of the record demonstrates that Plaintiff has introduced no evidence of either negligent hiring or retention — indeed, the identity of the

---

[3] The further removed the employee's actions with the box, of course, the stronger the argument would become that the claim sounds in premises liability, not ordinary negligence.

employee on the ladder is not made part of the record.  Accordingly, summary judgment will be granted in favor of Defendant on Plaintiff's negligent hiring/retention claim.

**D**

Finally, Defendant asserts that it is entitled to summary judgment on Plaintiff's damages. Def.'s Br. 12–13.  Specifically, Defendant asserts, "There is no medical evidence to support Plaintiff's claims of spinal cord or shoulder injuries, or that the incident affected his motor skills . . . .  Plaintiff's claims of injury therefore fail as a matter of law."  *Id*. at 13.  Defendant's argument is unpersuasive.

Following the accident, Plaintiff was taken to St. Mary's, where he was diagnosed with "acute closed head injury."  St. Mary's of Michigan Emergency Record 7.  Although the treating physician recommended that Plaintiff be admitted, he "signed out against medical advice."  *Id*.

About three months after the accident, Dr. Beltran performed a neurological examination of Plaintiff.  Beltran Medical Records, at 2–3.  Dr. Beltran noted that Plaintiff reported "decreased strength in his arms as well as tingling sensation," *id*. at 2, concluding: "I suspect this is secondary to post concussion syndrome with likely musculoskeletal pain."  *Id*. at 3.

The following month, Plaintiff saw Dr. Richard Lingenfelter.  (Prior to the accident, as noted, Plaintiff's medical records show that he had "normal functions of his upper extremities." Levin Medical Records, at 1.)  Dr. Lingenfelter reported that Plaintiff was unable to use his right hand and had limited use of his left hand, elaborating: "His right hand, his fingers are all panned up and look to be very uncomfortable, but patient denies any pain associated with that since he is unable to feel.  His left hand he does have in a swing arm attached to his wheelchair and he is able to bend his tips of his fingers and very limited mobility and function.  He is unable to move his bilateral lower extremities."  Lingenfelter Medical Records, at 3.

This evidence does not conclusively establish the extent of Plaintiff's damages — indeed, the causal nexus between the accident and the symptoms observed by Drs. Beltran and Lingenfelter is somewhat tenuous.  Nevertheless, drawing all reasonable inferences in Plaintiff's favor, he has offered evidence sufficient for a reasonable juror to conclude that Defendant's negligence injured Plaintiff, including his motor skills.  Defendant is not entitled to judgment as a matter of law on Plaintiff's claimed damages.

## IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 10) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Plaintiff's claims for gross negligence and negligent hiring/retention are **DISMISSED WITH PREJUDICE**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 14, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 14, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

---